(Reap. Dec. 10220)

ACETO CHEMICAL CO., INC. *v.* UNITED STATES

Entry No. 1006152.

(Decided April 5, 1962)

*Samuel I. Hendler* (*Richard M. Michaelson* of counsel) for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.

WILSON, Judge: This is an appeal for reappraisement of the value of a product known as acetoacetanilide, a coal-tar intermediate, ex-

ported from England on April 8, 1960, and entered at the port of New York.

The merchandise was appraised on the basis of American selling price (section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165), pursuant to the provisions of paragraph 27(c) of the said act, as amended, *supra*, at $0.80 per pound. The importer claims that the proper value of the merchandise based upon the above basis of appraisement is $0.7222 per pound. It appears from the record in this case that the appraised value of the merchandise was predicated upon the price or prices at which the product in question was sold by a domestic producer, the Union Carbide Corp., to certain of its purchasers. The price claimed to be the proper value of the imported merchandise represents that at which said product was sold by the Union Carbide Corp. to certain other purchasers from that company, viz, 72.22 cents per pound.

The provisions of the tariff act pertinent to the issue herein are as follows:

[Par. 27(c), Tariff Act of 1930, as amended, *supra*.] The ad valorem rates provided in this paragraph shall be based upon the American selling price of any similar competitive article manufactured or produced in the United States. If there is no similar competitive article manufactured or produced in the United States then the ad valorem rate shall be based upon the United States value.

[Section 402(e), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.] AMERICAN SELLING PRICE.—For the purposes of this section, the American selling price of any article produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the article in condition packed ready for delivery, at which such article is freely sold or, in the absence of sales, offered for sale for domestic consumption in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such article when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

[Section 402(f), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.] DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale,
  or

(B) in the ordinary course of trade
  to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

The parties to the controversy herein stipulated as follows: That New York is the principal market in the United States for the sale of acetoacetanilide (R. 30); that the imported merchandise is a coal-tar product, dutiable under paragraph 27(a)(3)(5) of the Tariff Act of 1930 (as modified) (R. 31) at the rate of $3\frac{1}{2}$ cents per pound, plus 25 per centum ad valorem (R. 32); that said merchandise is subject to valuation on the basis of American selling price, *supra* (R. 39); and that acetoacetanilide is manufactured and sold in the United States by the Union Carbide Corp. It was further stipulated between the parties that a chemical known as acetoacetanilide was, at the time of importation, manufactured by the Food Machinery & Chemical Co. and sold by the latter to the United States Industrial Chemical Division of the National Distillers Corp., which firm, in turn, resold the merchandise in the United States (R. 32–33). It was not conceded by plaintiff's counsel, however, that the product manufactured by the Food Machinery & Chemical Co. was the same in all respects as the merchandise here imported.

The plaintiff called three witnesses: Arnold Frankel, vice president and treasurer of the plaintiff corporation; Fred J. Rauscher, product manager for the Union Carbide Corp.; and James J. O'Connor, Jr., United States customs examiner. Mr. Frankel, in substance, testified that he was familiar with the market practices surrounding the sale of the product acetoacetanilide in the United States; that such product is primarily used in the manufacture of organic pigments (R. 43); that the annual consumption of such chemical in the United States ranges between 1,500,000 and 2,000,000 pounds, of which amount from 500,000 to 600,000 pounds are imported (R. 45); that the usual wholesale quantity as sold in New York, the principal market, is 250 pounds. The witness further stated that, to the best of his knowledge, the product sold by his company is substantially the same as that sold by the Union Carbide Corp. (R. 48, 54).

The gist of the testimony of plaintiff's witness Rauscher was as follows: The Union Carbide Corp. and the Food Machinery company are the only domestic producers of the involved product, it further appearing that the former company produces and sells at least

65 per centum of the total amount of this chemical marketed in the United States; that sales of the involved product were made by the Union Carbide Corp. to various customers at different prices, as shown by a list of sales for the first 4 months of 1960 (plaintiff's exhibit 5), viz, one purchaser (designated as customer "J") of a total of 104,000 pounds of the merchandise in 7 different lots paid 80 cents per pound in 6 instances and 81 cents per pound for the other purchase; customer "A" purchased 1,500 pounds during the same period for 73¾ cents per pound; customer "I" purchased 4,000 pounds at 72¾ cents per pound; customer "L" purchased 45,750 pounds at 73 cents per pound; and customer "Q" bought 38,500 pounds at 73½ cents per pound.

In explanation of the various purchase prices above indicated, Mr. Rauscher testified that the "customer J price is the price which we have as our scheduled price"; that the other customers paid prices at variance with that paid by customer "J" "because we were advised by these customers that they were able to buy material of foreign manufacture, imported material, at the prices that are indicated, and upon that advice, we agreed to supply them to meet that competition" (R. 84); that customers at the higher prices paid such prices "because they were satisfied to purchase the material at the price that we quoted them" (R. 95); that, in cases where the higher price of 81 cents was charged, less than "carload" quantities (30,000 to 33,000 pounds) were shipped at the time; where the 80-cent price was charged, carload lots or combination carload lots were shipped (R. 117). Plaintiff's witness further testified that the terms of sale for acetoacetanilide which is sold by Union Carbide Corp. is f.o.b. shipping point, "with freight allowed" (R. 125), "we pay the freight all the way from the point of manufacture to the consumer, regardless of whether shipped through the plant or through a warehouse. That freight is included in this price" (R. 126); that "the freight rates vary widely from perhaps one cent a pound to 3 cents a pound" (R. 132). Mr. Rauscher further testified that once a lower price was established on subsequent shipments "that price isn't re-established" (R. 140). The freight was still paid by the Union Carbide Corp., regardless of the "lower" prices on sales under 80 and 81 cents (R. 142).

Mr. James J. O'Connor, Jr., United States customs examiner, who recommended the value at which the involved merchandise was appraised, merely testified as to the methods employed in arriving at a determination of value of goods, among which was the use of pricelists of domestic manufacturers.

The issue in the case at bar is whether the American selling price of the imported merchandise is that at which it was appraised or

whether the price claimed by the plaintiff herein represents the correct value of the imported product. From all that is disclosed in the record herein, it would appear, as indicated, that appraisement of the involved merchandise was based upon certain pricelists issued by the Union Carbide Corp., a domestic producer of acetoacetanilide, and upon sales made by that company to certain of its purchasers in accordance with said pricelists. In *United States* v. *Mexican Products Co.*, 28 C.C.P.A. (Customs) 80, C.A.D. 129, the question involved was the proper value for appraisement purposes of certain glassware, exported from Mexico. The merchandise was entered at list prices, less a discount of 10 per centum, plus packing, and appraised at the entered list prices, less 5 per centum discount, plus packing. Our appellate court found, as did the trial court, that the discounts allowed purchasers by the Mexican manufacturer, both for consumption in Mexico and for export to the United States, depended upon either the status of the purchaser or his bargaining ability. Upon the record therein, the appellate court, in the *Mexican Products* case, *supra*, found that there was no evidence that merchandise like that there involved was sold or freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade in the principal market of Mexico, either for consumption in Mexico or for export to the United States, at prices less than the manufacturer's list prices. Accordingly, our appellate court, in that case, reversed the findings of the trial court and the appellate division of the Customs Court that the dutiable values of the involved merchandise were the manufacturer's list prices, less a discount of 10 per centum, plus packing, as claimed by the importer.

The holding in the *Mexican Products* case, *supra*, is not, in my opinion, controlling in the present determination. There, the finding of the court was based upon the provisions of sections 402 (c) and (d) of the Tariff Act of 1930 where the foreign and export values of imported merchandise were stated to be "the price * * * at which such or similar merchandise is freely offered for sale *to all purchasers* * * *." [Emphasis supplied.] The aforesaid sections of the tariff act in question were interpreted to require the court upon reappraisement to determine one price at which the merchandise was *offered* to *all* purchasers, and the holding in the *Mexican Products* case, *supra*, was predicated upon such determination. Here, however, the involved merchandise is subject to appraisement under the provision of section 402 (e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Under the latter provision, the American selling price of a domestic article is that at which "such article is freely sold or, in the absence of sales, offered for sale for domestic consumption in the principal market of the United States,

in the ordinary course of trade and in the usual wholesale quantities, or the price * * *." The present section of the act relative to appraisement under the American selling price formula specifically limits such price, when there are sales, to the price at which the merchandise was sold. It is only in the "absence of sales" that consideration must be given to offered prices. In the case at bar, there were sales of the product in question, and it is the American selling price of the article predicated upon such sales which accord with a free offering of the merchandise for domestic consumption in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities, which must be here determined.

Pertinent to the present determination, in my opinion, is the legislative history of section 402 of the tariff act, as amended by the Customs Simplification Act of 1956, as disclosed by the hearings held before the Committee on Ways and Means of the House of Representatives at the time said act (84th Congress, H.R. 6040) was under consideration. Representative Jere Cooper, chairman of said committee, stated as follows:

The definition of "American Selling Price" as provided in H.R. 6040 follows generally the definition contained in existing law with certain minor changes. As in the case of "export value" and "United States value" the language "sold or, in the absence of sales" is inserted before "offered for sale" in the definition. The language "to all purchasers" contained in present law is deleted. The reason for this deletion is that the term "all purchasers" in the present statute has been interpreted as meaning "all" in a sweeping literal sense. These words have caused considerable trouble in administering the valuation statute and the meaning ascribed to them by the courts does not comport the actual conditions under which a large part of the commerce of the world is conducted. This judicial construction has caused the departure from the concept of valuation of the United States as being predicated on transactions at the wholesale level. The judicial construction is impractical in the face of actual business realities and would be corrected by this legislation. [Congressional Record, volume 101, part 7, 84th Congress, first session, page 8983.]

It would, accordingly, appear from the amended provisions of section 402 and from the congressional intent, as heretofore expressed, that, in order to arrive at an American selling price, it is necessary to first determine whether there were sales of the domestic items and, further, whether the merchandise under consideration was sold at only one price. As indicated, section 402(f)(1)(A) of the Tariff Act of 1930, as amended, provides, *inter alia*, for sales "to all purchasers at wholesale." The latter price being established, such price would constitute the American selling price for appraisement purposes, all other elements being found present. In the case at bar, however, there was no one price at which the merchandise was sold. It is required, therefore, in my opinion, to have recourse to the provisions of section 402(f)(1)(B) to determine the price at which acetoacetanilide was

sold, at a sales price in the ordinary course of trade, to purchasers at wholesale "which fairly reflects the market value of the merchandise," and this notwithstanding the Government's contention that section 402(f)(1)(B) relates only to so-called "selected purchasers." The crux of the matter here is that there was no one price at which aceto-acetanilide was sold to *all* purchasers.

Essentially, the contention of the Government in support of the appraised value is that the sale made herein to a purchaser from Union Carbide Corp., a domestic producer, at $0.7275 per pound and sales to various other purchasers from that concern at prices lower than the appraised value or the list prices were so made as a result of bargaining on the part of the purchaser. Defendant, accordingly, argues that the holding of the court on this question in the *Mexican Products* case, *supra*, is applicable. I find this contention, however, without merit.

In the case at bar, the sales made by the Union Carbide Corp. to certain of its purchasers at prices lower than the appraised value were so made as a result of negotiation between the sellers and the buyers. There is no adequate evidence in the record that these sales by the domestic seller at lower prices than the appraised value were involuntary or such as were made under force. The domestic seller herein made sales to its purchasers at the lower prices freely and without compulsion. This appears evident from the testimony of plaintiff's witness Rauscher that if the largest customer of his concern requested a lower price, he would have recommended such lower price (R. 89; 98–99). These lower prices, in my opinion, "fairly reflect[s] the market value of the merchandise," since they were the prices at which the merchandise was freely sold within the terms of the statute.

With respect to the sale of acetoacetanilide at the price of 80 cents or 81 cents per pound, the record discloses that purchasers at said prices paid such higher amounts in order to insure a continuity of supply. This situation does not reflect a market "in the ordinary course of trade," and such sales were not made at a price "which fairly reflects the market value of the merchandise."

In an appeal for reappraisement, an importer has the twofold burden not only of overcoming the presumption of correctness attaching to the appraiser's determination of value, but also of proving the correctness of its own claim. *Brooks Paper Company* v. *United States*, 40 C.C.P.A. (Customs) 38, C.A.D. 495. In the case at bar, there was a presumption of correctness attaching to the appraised value. However, such presumption is rebuttable. The plaintiff, on its part, has established a sales price for the merchandise purchased by some buyers and, accordingly, has made out a *prima facie* case as to the correct value of the merchandise, which *prima facie* sales price has not been offset by any evidence on the part of the defendant. The

record discloses that the Food Machinery company produced domestic acetoacetanilide which was sold in the United States by the United States Industrial Chemical Co. (R. 164). Plaintiff, in the case·at bar, produced no evidence of the sales prices by the United States Industrial Chemical Co. of the product under consideration. However, I am of opinion that it is not incumbent upon the plaintiff to establish such prices, in order to support its claimed value. Here, there is evidence of sales to purchasers from the principal domestic producer at a price other than the appraised value, and, in my opinion, the price so paid "fairly reflects the market value of the merchandise." Specifically, plaintiff's exhibit 5 indicates a sale of 4,000 pounds of acetoacetanilide to "Customer I" at a price of 72¾ cents per pound (R. 82). This was the price fixed by mutual agreement between the buyer and the seller and was the price at the market place.

The record in the case at bar discloses that sales of acetoacetanilide made by the domestic producer were at f.o.b. shipping point, it further appearing that the manufacturer pays the freight and that it is included in the price of the merchandise (R. 126). There is testimony herein that if a customer took his purchased goods at the shipping point, an allowance for what a common carrier might receive for the transportation of such merchandise might be considered by the seller. However, there is nothing in the record showing that such a situation ever existed or that such an allowance as a matter of fact was ever made. It appears, therefore, that sales of the involved product by the domestic producer were at prices which included the item of freight and not at prices, less an actual allowance for freight. Inasmuch as the record in this case, in my opinion, supports a finding that the item of freight in the sale of acetoacetanilide by the domestic producer was incorporated in the sales price, such item is not an allowable deduction in the determination of the value of the involved merchandise. See, in this connection, the case of *United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T.D. 41454.

On the basis of the record here presented, I find as facts:

1. The involved merchandise consists of acetoacetanilide, a coal-tar product, exported from England on April 8, 1960.

2. The merchandise was appraised on the basis of American selling price, as defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, pursuant to the provisions of paragraph 27(c) of the act, as amended, at 80 cents per pound.

3. That Union Carbide Corp., a domestic producer, sold such merchandise to certain of its customers at a price of 72¾ cents per pound.

4. That the charge for freight made by the domestic producer at a minimum rate of 53 cents per 100 pounds was included in the price of 72¾ cents per pound at which the merchandise was sold by the domestic

producer and that such charge was a part of the sales price of the merchandise.

5. That there was no one price at which such merchandise was sold by the domestic producer to all purchasers.

6. That the price of 72¾ cents per pound at which merchandise, such as here involved, was sold by the domestic producer was in the ordinary course of trade at wholesale and that such price "fairly reflects the market value of the merchandise."

I find as matters of law:

1. That American selling price, as that value is defined in sections 402(e) and (f)(1)(B) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise herein, and

2. That such statutory value for the involved merchandise is 72¾ cents per pound.

Judgment will be rendered accordingly.